IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AHMAD NASIR | CRIMINAL ACTION<br>NO. 24-298-2 |

**Pappert, J.**                                                                                          April 15, 2025

## MEMORANDUM

On July 10, 2021, while Ahmad Nasir was detained in the Philadelphia Industrial Correctional Center pending trial on first-degree murder charges, correctional officers searched his cell. They found, among other contraband, twenty cell phones and one-hundred-and-eleven packets of Suboxone. On August 20, 2024, based on this and other evidence, a grand jury returned an indictment charging Nasir with conspiring to bribe and bribing a state prison official in violation of 18 U.S.C. §§ 371 & 666(a), and conspiracy to knowingly possess and knowingly possessing with intent to distribute Suboxone in violation of 21 U.S.C. §§ 841(a)–(b) & 846. Nasir moves to suppress the evidence found in his cell as well as data obtained from a subsequent forensic search of the phones. The Court held a suppression hearing on April 9, 2025 and denies Nasir's Motion in all respects.

I

During the summer of 2021, and in the wake of the COVID pandemic, PICC officials noticed that "significant amounts of contraband" cell phones and drugs were turning up in the F, G and H Units of the prison despite the institutional lockdown and

1

cancellation of visitations. (Aff. of Prob. Cause ¶ 9, ECF No. 57.) At the time, Nasir was being detained in Unit G pending trial on state first-degree murder charges. (*Id.* at 27.) On July 10, 2021, at around 6:00 a.m., correctional officers under the direction of then-Lieutenant Osvaldo Rodriguez[1] searched Nasir's cell for contraband. (Supp. H'rg Tr. at 14:21–23, ECF No. 60.) The officers found in a light fixture nineteen cell phones, twenty phone chargers, three hunting knives, one rapid charger, two containers of super glue, two screwdrivers, one roll of tape, one bag containing what appeared to be the drug K2, one bag with Tobacco, one white pill, and one-hundred-and-eleven packets of the Schedule III drug Suboxone. (*Id.* ¶ 16:10–25); (Aff. of Prob. Cause ¶ 35). Pursuant to prison policy, (Inmate Handbook at 26, ECF No. 57-2), the correctional officers then asked Nasir to remove his clothes, and a twentieth cell phone dropped from his waistband. (Mot. to Supp. at 3, ECF No. 47); (Resp. in Opp. to Mot. to Supp. at 5, ECF No. 57.)

On March 31, 2022, FBI Special Agent Joseph O'Connor filed an affidavit of probable cause in support of a request that Magistrate Judge David Strawbridge issue a warrant authorizing the search of the phones found in Nasir's cell.[2] *See generally* (Aff. of Prob. Cause). The affidavit relied on evidence gathered during a search of Correctional Officer Haneef Lawton's cell phone on June 3, 2021. (*Id.* ¶¶ 12–19.) Lawton, who was employed at PICC, was under indictment for his involvement in a contraband-smuggling scheme. (*Id.* ¶¶ 12–19.) On Lawton's cell phone, SA O'Connor

---

[1] Rodriguez is now a captain with the Philadelphia Department of Prisons. (Supp. H'rg Tr. at 8:9–10.)

[2] The affidavit of probable cause asks for authorization to search twenty-six cell phones, but only twenty of those phones are attributable to Nasir. *See* (Aff. of Prob. Cause at, Ex. A).

2

found numerous text messages between Lawton and Nasir relating to that scheme. (*Id.*) Judge Strawbridge issued the warrant on March 31, 2022, authorizing the seizure of "evidence, contraband, fruits and instrumentalities of violations" of 18 U.S.C. §§ 371 & 666 and 21 U.S.C. §§ 841 & 846.  (Search Warrant, ECF No. 57-1.)

II

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  For a search or seizure to be reasonable, it must be carried out pursuant to a warrant based on probable cause unless an exception applies. *See United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).  "To deter Fourth Amendment violations, when the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial." *United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (en banc) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)).

A defendant must have Fourth Amendment standing to invoke the exclusionary rule. *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011) (citing *Minnesota v. Olson,* 495 U.S. 91, 95 (1990)).  "Standing in the Fourth Amendment context is shorthand for a legitimate expectation of privacy and is not a jurisdictional requirement." *United States v. Jackson*, 849 F.3d 540, 550 n.7 (3d Cir. 2017) (cleaned up).  The defendant must have both an objectively reasonable expectation of privacy

3

and a subjective expectation of privacy. *Correa*, 653 F.3d at 190. The objective prong asks whether the expectation of privacy is "one that society is prepared to recognize as reasonable." *Bond v. United States,* 529 U.S. 334, 338 (2000) (quotations and citation omitted). For the subjective prong, courts consider "whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private." *Id.* (cleaned up).

Generally, the party seeking to suppress evidence bears the burden of proof. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). However, once the defendant establishes a basis for suppression, the burden shifts to the government to show by a preponderance of the evidence that the search or seizure was reasonable. *Id.* at 245. "[D]eference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 330 (2012).

### III

### A

Nasir first moves to suppress the physical evidence collected during the search of his cell, including the twenty cell phones and packets of Suboxone. (Mot. to Suppress at 5.)[3] Prisoners lack Fourth Amendment standing to challenge searches of their cells because the "recognition of privacy rights for prisoners in their individual cells simply

---

[3] The twentieth cell phone was discovered after the search of Nasir's cell, when he was strip searched pursuant to PICC policy. *See* (Mot. to Suppress at 3); (Resp. to Mot. to Suppress at 5); (Inmate Handbook at 26). At the hearing, defense counsel acknowledged, correctly, that if the search of the cell was constitutional, the search of Nasir's person was also constitutional. (Supp. H'rg Tr. at 49:1–5.) Courts analyzing strip searches must balance the "need for a particular search . . . against the resulting invasion of personal rights." *Florence*, 566 U.S. at 327. The search here was not a body cavity search, minimally invasive and conducted after guards found a stash of dangerous contraband in his cell.

cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984). Relying on the Second Circuit Court of Appeals decision in *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), Nasir contends that, as a pre-trial detainee at the time of the search, he had a legitimate expectation of privacy in his cell. (Mot. to Suppress at 4–5.) In *Cohen*, the prosecutors assigned to a pre-trial detainee's case asked prison officials to search Cohen's private papers in search of evidence to "bolster" their case against him. *Id.* at 21. The Second Circuit held the warrantless search was unconstitutional, reasoning that pre-trial detainees enjoy a legitimate expectation of privacy within their cells when a search is conducted (1) "at the instigation of non-prison officials," and (2) "for non-institutional security related reasons"—i.e., for the sole purpose of "bolster[ing] the prosecution's case against a pre-trial detainee awaiting his day in court." *Id.* at 23.[4]

Nasir relies solely on *Cohen*, (Supp. H'rg Tr. at 41:5–11), and asks the Court to adopt its reasoning, which no other Court of Appeals, nor any judge in this district, has done. But even if the Court found *Cohen* persuasive, it does not apply to the search of Nasir's cell because neither of its prerequisites are satisfied. The core of Nasir's argument is that the search was likely instigated by Lawton's prosecutors because (1) Lawton was indicted a month-and-a-half before the search of Nasir's cell, and (2) by the time of the search, the Government had discovered text messages between Lawton and

---

[4] Neither the United States Supreme Court nor the Third Circuit Court of Appeals has held that pre-trial detainees retain greater expectations of privacy than ordinary prisoners. However, the Supreme Court has said that searches of a detainee's cell "represent an appropriate security measure," and refuted that "even the most zealous advocate of prisoners' rights would [] suggest that a warrant is required to conduct" a search of a detainee's cell. *Bell v. Wolfish*, 441 U.S. 520, 557 (1979).

Nasir. (Mot. to Supp. at 2); (Supp. H'rg Tr. at 42:21–25, 43:1–9); (Aff. of Prob. Cause at 21.)

But Rodriguez credibly testified that Nasir's cell was not searched at the behest of any prosecutor and there was no evidence presented to the contrary. Although he couldn't remember exactly what induced them to search Nasir's cell, be it a random security search or based on information from other inmates, Rodriguez knew the search was not at the direction of any prosecutor, including anyone handling Lawton's case. (Supp. H'rg Tr. at 11:1–18.) At the time of the search of Nasir's cell, he had heard rumors about the indictment against Lawton, but did not know any specifics and never communicated with the prosecutors handling Lawton's case. (*Id.* at 10:12–21, 11:1–2.) And he said that "in [his] 22 years" with the Philadelphia Department of Prisons, he had never "been called by the DA or anyone to search a cell." (*Id.* at 11:7–11.)[5]

Nor was there any evidence that the search of Nasir's cell was conducted for a non-institutional security purpose. Unlike in *Cohen*, where those prosecuting Cohen requested the search of his private papers to collect evidence that would "bolster" the prosecution's case against him, Rodriguez testified that the purpose of the search here was to find contraband. (Supp. H'rg Tr. at 16:1–5.)[6] Further, even if those prosecuting Lawton told PICC officials of Nasir's illicit communications with Lawton, prison

---

[5] Rodriguez's testimony comports with the affidavit of probable cause. In the months leading up to the search, prison officials in the PICC noticed that "significant amounts of contraband" cell phones and drugs were being found in the F, G, and H Units of the prison despite the COVID lockdown and cancellation of visitations. (Aff. of Prob. Cause ¶ 7.) The affidavit describes prison officials' "routine" and "random" searches of numerous cells within the F, G and H Units during the same timeframe. (*Id.* ¶¶ 3, 7, 48, 49, 58.) Nasir was housed in cell #47 of the G Unit. (*Id.* at 27.)

[6] It is also noteworthy that, unlike in *Cohen*, Nasir contends it was those prosecuting *Lawton* who requested the search, not those prosecuting Nasir. This undermines Nasir's argument that the purpose of the search was to "bolster" the prosecution's case against him, as they were not the ones prosecuting him.

6

officials would have been justified in searching Nasir's cell for the purpose of seizing contraband cell phones, which pose serious institutional-security risks. *See* (Inmate Handbook at 41–42) (listing the possession of electronic devices among PICC's "critical infractions"—which is the most serious category of conduct); *United States v. Blake*, 288 Fed App'x 791, 794 (3d Cir. 2008) (describing the "patent" security risks presented by an inmate' possession of a cell phone); *United States v. Stanishia*, 687 Fed. App'x 183, 185–86 (3d Cir. 2017) (declining to adopt *Cohen* but noting that a search of a cell is acceptable if "prison officials would have searched the area—regardless of an FBI request to investigate a possible crime—upon learning about a possible contraband cell phone because a cell phone in a prison poses serious institutional security risks.").

B

Nasir also contends the search warrant authorizing the subsequent forensic search of the phones found in his cell was overbroad and seeks suppression of the data recovered from the phones. (Mot. to Suppress at 10–11.) In his view, authorities should have only searched for text-message conversations on the phones. (Supp. H'rg Tr. at 52:7–13.) He relies on *Riley v. California*, 573 U.S. 373, 403 (2014), in which the United States Supreme Court held law enforcement must obtain a search warrant before searching a cell phone seized incident to arrest. But the arrestee in *Riley* lawfully owned his cell phone and enjoyed a legitimate expectation of privacy in its contents. Nasir, on the other hand, has no legitimate expectation of privacy in the contraband cell phones. *See, e.g., United States v. Basaldua*, No. 19-4, 2021 WL 5851448, at *3 (M.D. La. Dec. 9, 2021) ("While a cell phone may 'hold for many Americans the privacies of life,' as a prisoner, Basaldua is not afforded 'the privacies of

7

life.'") (quoting *Riley*, 573 U.S. at 403; *United States v. Garibay*, No. 13-4514, 2015 WL 468404, at *1 (S.D. Cal. Feb. 2, 2015); *United States v. Nava*, No. 17-347, 2018 WL 5624731, at *4 (N.D. Ga. Aug. 9, 2018), *report and recommendation adopted by United States v. Nava*, No. 17-347, 2018 WL 4350183 (N.D. Ga. Sept. 12, 2018). *See also* (Inmate Handbook at 41–42). Thus, Nasir lacks Fourth Amendment standing to challenge the seizure of data from these contraband phones, and a warrant was not necessary to search them.

Even if Nasir had standing to challenge the forensic cell-phone search, the warrant was not overbroad. An overbroad warrant "describe[s] in both specific and inclusive generic terms what is to be seized, but . . . authorizes the seizure of items as to which there is no probable cause." *United States v. $92,422.57*, 307 F.3d 137, 149 (3d Cir. 2002) (citation and quotations omitted). Courts can cure overbroad warrants by "striking from [the] warrant those severable phrases and clauses that are invalid . . . and preserving those severable phrases and clauses that satisfy the Fourth Amendment." *Id.* at 149 (citation and quotations omitted).

Nasir does not identify which phrases or clauses are overbroad and should be severed. He contends simply that the search warrant authorized a seizure that was "all-encompassing," that there was "no effort at all to narrow the scope of the data searched and seized," and that "it appears to be a total 'phone dump'." (Mot. to Supp. at 10.) Nasir does not explain how the search was all-encompassing; to the extent he contends the warrant authorized the search of content unrelated to the charged offenses, he is incorrect. "[G]iven the nature of computer files and the tendency of criminal offenders to mislabel, hide, and attempt to delete evidence of their crimes, it

8

would be impossible to identify *ex ante* the precise files, file types, programs and devices that would house the suspected evidence." *United States v. Karrer*, 460 Fed. App'x 157, 162 (3d Cir. 2012). Rather, what matters is that the warrant "specifies the items to be seized by their relation to the designated crime." *United States v. Bellucci*, No. 23-83, 2023 WL 8528433, at *7 (M.D. Pa. Dec. 8, 2023).

That is the case here. The affidavit of probable cause describes text messages from Lawton's phone that created probable cause to believe that Nasir was using contraband cell phones to coordinate the smuggling of contraband into PICC in exchange for bribes. *See, e.g.*, (Aff. of Prob. Cause at ¶ 33). Further, SA O'Connor attested that he knew from "training and experience" that inmates "use illegally possessed cellular phones to make calls outside the facility" and that "cellular phones can store information for long periods of time." (*Id.* at ¶¶ 59–61.) Attachment B to the affidavit of probable cause listed the "documents," "records" and "information" to be gathered from particular data sources within the cell phones, such as text messages, call logs, contact lists, memoranda, etc. (*Id.*, Att. B, at 45.) The warrant limited the items to be seized to "evidence, contraband, fruits and instrumentalities" of the charged offenses as "described in Attachment B." (Search Warrant.) Warrants that authorize the seizure of such digital information have consistently been found to be reasonable, especially where, as here, the "affiants were aware that the defendant used his cell phone to conduct deals, and . . . of the ways in which [similar defendants] used their phones." *Bellucci*, 2023 WL 8528433, at *7; *see also United States v. Gorny*, No. 13-70, 2014 WL 2860637, at *8 (W.D. Pa. June 23, 2014); *Karrer*, 460 Fed. App'x at 162–63.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
Gerald J. Pappert, J.
